1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FLOYD LOWE,

11              Petitioner,              No. CIV S-02-0882 LKK GGH P

12       vs.

13   A. K. SCRIBNER, Warden,[1] et al.,

14              Respondents.             FINDINGS AND RECOMMENDATIONS
                                _____/

15

16   I.   Introduction

17              Petitioner is a state prisoner proceeding with appointed counsel on a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted and sentenced to a

19   term of 25 years to life for being a felon in possession of a firearm.  Petition, p. 2.  The

20   complicated procedural history of this conviction is contained below.

21              The second amended petition raises the following claims: 1) ineffective assistance

22   of appellate counsel; 2) sentence violates petitioner's due process rights under the Fifth and

23   Fourteenth Amendments; 3) petitioner denied his Sixth Amendment right to trial on the

24   possession of a firearm count; 4) life sentence for the status offense of being a felon in possession

25   _____

26          [1] Per petitioner, A. K. Scribner has replaced George Galaza as the warden at Corcoran
     State Prison; thus, Warden Scribner is substituted in as respondent.  Fed. R. Civ. P. 25(d)(1).

                                        1

1   of a firearm is cruel and unusual punishment and grossly disproportionate to the offense in

2   violation of the Eighth Amendment; 5) conviction and life sentence for the status offense of

3   being a felon in possession of a firearm violates petitioner's right to due process and the Eighth

4   Amendment prohibition against cruel and unusual punishment because the only evidence that he

5   possessed a firearm independent of the invalid verdicts was not found by the jury to be true

6   beyond a reasonable doubt.

7          As will be seen from a complete discussion, petitioner's claims here flounder

8   under the misconception that because a murder charge was reversed for improper jury

9   instructions, and the jury failed to convict on an attempted murder charge, a felon in possession

10  charge based on the same evidence utilized for the above charges is legally impossible.

11  Petitioner primarily urges the grant of this petition under the theory that guilt was not proved

12  beyond a reasonable doubt (Winship error), or that the jury did not determine his guilt (Apprendi

13  error) – however, those theories fail to grasp the fact that guilt on the felon-in-possession charge,

14  the charge of ultimate judgment, was actually returned by a jury based on evidence which was

15  never itself found tainted.[2]

16          A. Factual Background

17          The third district court of appeal opinion contains a comprehensive factual

18  summary from which petitioner quotes extensively (see memorandum of points and authorities in

19  support of second amended petition, pp. 3-5) and with which respondent is not in dispute. The

20  court adopts the facts as set forth in the opinion:

21                                  A

22          The shootings took place in February 1996. At the time, Kimberly
           B. and her then-boyfriend (now husband), Alex R., were living in a

23

24          [2] Petitioner also flirts with the notion that insufficient evidence existed for the felon in
    possession charge, but then just as quickly appears to disclaim it. Compare Traverse at 7: "The

25  guilty verdicts the jury returned were tainted either by the prosecutor's legally unsupported
    theories of criminal liability or from a lack of sufficient evidence to support them," with "First,

26  the issue presented is not the sufficiency of the evidence alone...."

small apartment on S. American Street with a friend, LeJohn T. LeJohn T. was the nephew of their neighbor. Kimberly B. slept in the bedroom with the children; Alex R. and LeJohn T. slept on sofas in the living room. When Kimberly B. went to sleep at 10 p.m., Alex R. was getting ready for bed and LeJohn T. was not yet home.

Kimberly B. awakened to the sound of Alex R. shouting to LeJohn T., asking who were the two men in the living room with them. She went into the darkened living room and could see the shadowy outlines of two people standing there. She made her way into the kitchen to turn on the light. She saw two men with stockings on their heads. The taller one, who had a gun, grabbed her as she stepped back into the kitchen and stuck the gun into her cheek. She saw her boyfriend wrestling with the smaller one (who was the defendant; she was acquainted with him from the neighborhood, but had never met him formally). The taller intruder let her go and went to help the defendant. She noticed LeJohn T. was still lying on his sofa.

Looking for a way to escape, Kimberly B. crossed the living room. Alex R. was wrestling with both the intruders. She did not recall anyone saying anything during the fracas. She heard the gun go off. She ran into the bedroom, kicked the screen out of the window, and jumped. In all, she heard three or four shots with pauses between them. She called 911 from a neighbor's home. The police arrived quickly and went up to the apartment. They brought Alex R. downstairs. Emergency personnel transported the couple to the hospital (she had broken her ankle, and he was bleeding from an injury to his hand).

B

Alex R. testified he had gone to sleep, and first awoke at an undetermined time when LeJohn T. came home and made a phone call. He fell back asleep. He then awakened to the sound of the front door being kicked in. Two men entered, one tall and one short. He had no idea of the taller one's identity, but was familiar with the defendant. Alex R. began shouting to LeJohn T. about the presence of intruders, then pleaded with the men to leave. The defendant told him to shut up. Alex R. did not notice any weapons at first.

He saw his girlfriend come out of the bedroom and turn on the kitchen light. When she came back into the living room, the taller intruder grabbed her and stuck a gun in her face. In the meantime, the defendant was holding LeJohn T., down on the other sofa. Alex R. began to struggle with the defendant; in the process, he lost track of LeJohn T.'s whereabouts. At some point (Alex R. could not recall exactly when) the defendant began to shout in a loud whisper for his accomplice to "shoot him, shoot him." The

taller intruder came over to assist the defendant.  Alex R. saw the gun in the taller man's hand and tried to grab it.  He and the two intruders all struggled for control of the weapon.  The gun began to fire as they wrestled around the room; he could not recall the number of shots or their timing.  All three had their hands on the gun; his own hand was not on the trigger.

They all fell to the ground. The taller man bit Alex R.'s hand, who released the gun.  The defendant wrested the gun away, pointed it at Alex R., and pulled the trigger several times; there were no bullets left in the gun.  Alex R. ran into the bedroom to check on the safety of their children, and thought about jumping out the window.  Looking back, he saw the defendant, dragging the taller man out the front door.  He then noticed he had been shot in the finger.

C

The defendant testified. His version of events is sharply at odds with the two survivors.

On the evening of the shootings, he stopped by the home of his friend Robert White and asked him to come along while he visited his child's mother, who was the neighboring aunt of LeJohn T. They borrowed a car belonging to the woman the defendant was then dating (and later married).  When they first arrived, the defendant saw Alex R. and LeJohn T. outside, and briefly spoke with them, finding out the aunt was not home.  He noticed Alex R. had a gun in his possession.  The defendant then went to visit someone else.  When he returned, Alex R. was still outside.  Alex R. asked him about facilitating a drug purchase.  The defendant demurred, going upstairs to talk to LeJohn T. (who was on the landing).  He saw Robert White drive off with Alex R. in the car.

When the car returned, Alex R. was arguing with Robert White, demanding the return of some money. Alex R. stormed into the apartment, followed by Robert White. The defendant and LeJohn T. heard a shot. They went into the apartment, and saw Robert White was bleeding from his hand. Alex R. told LeJohn T. to sit on the sofa, then turned and shot the defendant in the leg. The defendant turned to run, collapsing outside the apartment.  He heard more shots.  Alex R. came out and fired the gun at him several times, but there were no more bullets.  He then pistol-whipped the defendant in the face.  The defendant lay there until the police arrived.  At the hospital, he told them Alex R. had shot him in the course of an argument about stolen registration tags.

Defendant denied ever seeing Kimberly B. that evening, or seeing Robert White hold a gun to her head. He was never involved in any struggle for a gun.  The gun the police retrieved did not belong to him, and he did not know the source of a container of bullets the

4

1  police found in the glove box of the car he arrived in which
   matched the gun (he opined Alex R. had left it in the car when he
2  drove off with Robert White). For purposes of the gun-possession
   charge against him, he admitted he had a1988 conviction for
3  assault with a deadly weapon.

4                                  D

5  For purposes of tying up loose ends, we note the police who
   responded to a 12:10 a.m. dispatch found the defendant lying at the
6  bottom of the stairwell with a gunshot wound in his leg. Robert
   White was lying on the landing in front of the door to the
7  apartment, with a gunshot wound to the groin area. When
   emergency personnel moved Robert White, the police found a gun
8  underneath him. The police found LeJohn T. dead on the
   livingroom floor. He had bled to death from a gaping wound to his
9  shoulder, and may have asphyxiated as well because the bullet had
   lodged in his larynx. Robert White eventually bled to death from
10 severed blood vessels in his pelvis. The bullets retrieved from the
   bodies came from the gun which the police found under Robert
11 White.

12 Petitioner's Exh. A, Third District Ct. of Appeal Opinion, filed on 10/4/99, pp. 4-8.

13         B.  Procedural Background

14         In a September 27, 1996 information, petitioner was charged with two counts of

15 murder (counts 1 and 2), attempted murder (count 3), assault with a firearm (count 4), burglary

16 (count 5), and possession of a firearm by a convicted felon (count 6). Special circumstances

17 were alleged as to counts 1 and 2; in addition, for counts 1-5, it was alleged that a principal was

18 armed with a firearm. It was also alleged that petitioner had been convicted of three prior serious

19 felonies. Trial on the prior conviction allegations was bifurcated from the jury trial. On

20 February 4, 1998, the jury found petitioner guilty of second degree murder in counts 1 and 2,

21 guilty of assault with a firearm in count 4, guilty of possession of a firearm by an ex-felon in

22 count 6. On Feb. 4, 1998, petitioner waived a jury as to the priors and the court found two of the

23 alleged priors to be true. The trial court dismissed count three, attempted murder, on the

24 prosecutor's motion. On April 4, 1998, the trial court sentenced petitioner to a prison term of

25 141 years to life. Petitioner was sentenced to 25 years to life for felon in possession of a firearm

26 conviction. Second Amended Petition (AP), pp. 2-3, citing Clerk's Transcript (CT) 45-54; 373-

                                        5

1   374; 573; 578-579; 581-583; 629-630; 639.  Reporter's Transcript (RT): 11.

2          On direct appeal, the California Court of Appeals vacated petitioner's second

3   degree murder convictions, remanding for retrial, and reversed the assault with a firearm

4   conviction for insufficient evidence (count 4), directing the trial court to enter a judgment of

5   acquittal as to count 4.  Petitioner's conviction for possession of a firearm by a felon (count 6)

6   was affirmed as were the findings on the prior convictions.  AP, p. 3, citing CT 662; 671-672;

7   675; Exh. A, 10/5/99 Third District Court of Appeal Opinion.

8          There was no new trial on remand.  Instead, the superior court dismissed the two

9   counts of murder (counts 1 and 2) on the district attorney's motion, dismissed the assault with a

10  firearm count (count 4) per the order of the state court of appeals, and resentenced petitioner to a

11  term of 25 years to life for the remaining count (count 6), possession of a firearm by a convicted

12  felon.  The restitution fine was also increased.  AP, p. 3, citing CT 686-687.

13         On a second appeal, the increased fine was reduced but the judgment was

14  otherwise affirmed.  Id, citing Exh. B, 3/19/01 Third District Court of Appeal Opinion.

15         Petitioner exhausted his federal constitutional challenges in habeas petitions to the

16  state supreme court.  Petition, pp. 3-4, & Exhs. C, D, E, F.

17  II.  AEDPA

18         The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

19  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

20  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997).  The AEDPA "worked

21  substantial changes to the law of habeas corpus," establishing more deferential standards of

22  review to be used by a federal habeas court in assessing a state court's adjudication of a criminal

23  defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

24  1997).

25         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

26  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

1   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

2   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

3   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

4   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

5   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

6   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

7             "Unreasonable application" of established law, on the other hand, applies to

8   mixed questions of law and fact, that is, the application of law to fact where there are no factually

9   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

10  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

11  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

12  deference is not blindly automatic, "the most important point is that an *unreasonable* application

13  of federal law is different from an incorrect application of law....[A] federal habeas court may not

14  issue the writ simply because that court concludes in its independent judgment that the relevant

15  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

16  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

17  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

18  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

19  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

20            The state courts need not have cited to federal authority, or even have indicated

21  awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

22  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

23  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

24  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

25  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

26  established Supreme Court authority reviewed must be a pronouncement on constitutional

1    principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

2    binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

3           However, where the state courts have not addressed the constitutional issue in

4    dispute in any reasoned opinion, the federal court will independently review the record in

5    adjudication of that issue.  "Independent review of the record is not de novo review of the

6    constitutional issue, but rather, the only method by which we can determine whether a silent state

7    court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

8    2003).

9    III.   Discussion

10          As to the first two claims, the court will address the claims in a logical

11   progression, beginning with what petitioner has denominated claim 2, before reaching

12   petitioner's first claim, ineffective assistance of appellate counsel.

13          A.   Claim 2 - Sentence violates petitioner's due process rights under the Fifth and

14   Fourteenth Amendments

15          It is petitioner's contention that his life sentence violates his Fifth and Fourteenth

16   Amendment due process rights because there was no retrial.  AP, p. 6.  As stated in the state

17   court appellate decision (supra), petitioner observes that there was no evidence presented that the

18   defendant possessed the gun at any point before the fatal struggle with Robert White and Alex R;

19   however, there was evidence presented by Alex Ripoyla that after the two fatal shootings (and

20   the nonfatal injuries to petitioner and Alex R.), that petitioner "wrested the gun away, pointed it

21   at Alex R., and pulled the trigger several times; there were no bullets left in the gun."  AP, p. 6,

22   Exh. A, p. 6.

23          Petitioner asserts that as the jury did not convict petitioner of attempted murder of

24   Alex Ripoyla, a charge dismissed by the trial court after the jury failed to reach a unanimous

25   verdict on that count and the prosecutor subsequently moved to dismiss it (CT 587, 595), there

26   was no valid verdict supporting the conviction for possession of a firearm by a felon upon which

1   the life sentence was imposed, citing Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348

2   (2000), and In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970).  It is the well-

3   established holding of Winship "that the Due Process Clause protects the accused against

4   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

5   crime with which he is charged." Id.  This fundamental precept is not implicated here, however,

6   where the jury did reach a verdict on count 6, finding petitioner guilty beyond a reasonable doubt

7   of being a felon in possession of a firearm (CT 583), a conviction undisturbed by the state court

8   of appeals.

9          Petitioner, in his traverse, claims that the guilty verdicts were either tainted by the

10  prosecution's legally tainted theories of criminal liability or suffered from a lack of sufficient

11  evidence.  Traverse, p. 7.  Petitioner argues that while the state court of appeals found the jury's

12  acquittal of petitioner on the attempted murder count to be "unaccountable," that the rational

13  explanation for the inability of the jury to reach a verdict on this count is that the jurors simply

14  did not believe the prosecution's evidence related to this charge beyond a reasonable doubt.  Id.

15         To respondent's hypothesis that the jury simply may not have believed that

16  petitioner had the specific intent to kill Alex Ripoyla but did unanimously determine that

17  petitioner was a felon who possessed a firearm, petitioner counters that it is plausible to believe

18  that the jury rejected A. Ripoyla's testimony in its entirety.  Traverse, p. 8.

19         As both parties (and the state court of appeals) note, the testimony of Alex

20  Ripoyla was evidence presented to the jury with respect to the question of whether petitioner

21  possessed a firearm.  The fact that the jury did not unanimously find petitioner guilty of

22  attempted murder of A. Ripoyla beyond a reasonable doubt, a separate count, does not undermine

23  the jury's unanimous finding that the prosecution proved that petitioner possessed the firearm

24  beyond a reasonable doubt.  Respondent cites to the record of petitioner's having been convicted

25  on this separate count.  Answer, citing CT 373, 573[-574], 578-579, 581, 583.  Petitioner's

26  assertion that the jury "must have disbelieved Ripoyla" because it refused to find attempted

1   murder of Ripoyla is pure speculation.  It is just as likely that the jury found the attempted

2   murder to be a factual impossibility due to the lack of ammunition in the gun at the time.  The

3   fact remains that the jury must have believed Ripoyla because it did return guilt verdicts on the

4   murder charges – charges which were almost entirely based on Ripoyla's version of the events.

5           While it is true that the jury found, in enhancement, that petitioner possessed a

6   firearm in the commission or attempted commission of two counts of second degree murder and

7   a count of assault with a firearm within the meaning of Cal. Penal Code § 12022(a),[3] and that the

8   underlying counts and these enhancements were later reversed on appeal, the record makes clear

9   that petitioner was separately found guilty of count 6, a violation of Cal. Penal Code §

10  12021(a)(1):[4] "possession of firearm by a felon with prior(s)...."  CT 373, 583, 639.   The

11  elements of this offense "are conviction of a felony, ownership, possession, custody or control of

12  a firearm."  People v. Jeffers, 41 Cal. App. 4th 917, 922, 49 Cal. Rptr. 86 (1996), citing People v.

13  Bray, 52 Cal. App. 3d 494, 497, 124 Cal. Rpttr. 913 (1975); People v. Neese, 272 Cal. App. 2d

14  235, 245, 77 Cal. Rptr. (1969); People v. Nieto, 247 Cal. App.2d 364, 368, 55 Cal. Rptr. 546).

15  While knowledge is also an element of this offense, "[n]o specific criminal intent is required for

16  this crime; general intent to commit the proscribed act is sufficient to sustain a conviction."

17  People v. Jeffers, 41 Cal. App.4th at 922 (citations omitted).  The offense is not one of strict

18  liability; thus, a felon who acquires possession of a firearm by "misfortune or accident" commits

19  

---

20      [3] "[A]ny person who is armed with a firearm in the commission of a felony or attempted
21  felony shall be punished by an additional and consecutive term of imprisonment in the state
    prison for one year, unless the arming is an element of that offense.  This additional term shall
22  apply to any person who is a principal in the commission of a felony or attempted felony if one or
    more to the principals is armed with a firearm, whether or not the person is personally armed
23  with a firearm."  Cal. Penal Code § 12022(a)(1), in relevant part.

24      [4] "Any person who has been convicted of a felony under the laws of the United States, of
    the State of California, or any other state, government, or country, or of an offense enumerated in
25  subdivision (a), (b), or (d) of Section 12001.6, or who is addicted to the use of any narcotic drug,
    who owns, purchases, receives, or has in his or her possession or under his or her custody or
26  control any firearm is guilty of a felony."  Cal. Penal Code § 12021(a)(1).  (Cal. Penal Code §
    12001.6 sets forth "offenses involving the violent use of a firearm").

1   the prohibited act but does not have the requisite general intent.   Id.

2           [K]nowledge plus physical possession may ordinarily demonstrate
        an intent to exercise dominion and control but knowledge does not
3       conclusively demonstrate such intent as a matter of law.
        Otherwise, a felon would be strictly liable for the crime
4       immediately upon finding a firearm, even if found under innocent
        circumstances.

5

6   Jeffers, supra, 41 Cal. App. 4th at 922.

7           The relevant testimony of A. Ripolya on direct examination, on at least some

8   portion of which the state appellate court found that the jury had relied to find petitioner to be a

9   felon in possession of a firearm, is as follows:[5]

10          Q.  What happened when you were struggling with the little guy?
        A.  Well, I was struggling with the little guy, that's when the big
11      guy tried to grab me.
        Q.  How - - could you see the big guy come over?
12      A.  No, I didn't, until he like tried to wrap his hand around me, his
        arms around me.
13      Q.  What did you do then?
        A.  Well, when he went like that, I seen the gun.  It was in my face.
14      So my attention was try to grab it from them.
        Q.  Did you grab at the gun?
15      A.  No, everybody's hands was on the gun.
        Q.  Where were hands, can you recall?
16      A.  On the gun, like the back part.
        Q.  What was - -
17      A.  We were struggling with it.  They were trying to face it towards
        me.  I pushed it back.  They face it back at me.  I push it away.
18      ....................................................................................................

19  RT 386-387.

20          Q.  How many guns did you see inside the apartment at that time?
        A.  Just that one.
21      Q.  Just the one gun you saw?
        A.  Yeah.
22      Q.  Did you ever see any other weapons?
        A.  No.
23      Q.  The struggle over in the corner between you and the bigger
        male and smaller male as you were struggling, did you see anything
24      on their faces?

25  _____

26      [5] No dispute is raised that the witness, in referencing "the little guy," intends to signify
    petitioner herein.

1
A.  Yeah, like a stocking over their face.
Q.  On one or both of them?

2
A.  On both of them.
Q.  What happened as the struggle continued, do you recall?

3
A.  We was just struggling and struggling and then - - well, I don't
get your question.

4
Q.  Did you hear gun fire?
A.  Yeah, it was going off.

5
Q.  I guess that's what I'm asking.  Do you recall how the gun was
going off?

6
A.  It was just going off.
Q.  Do you recall when the first shot was fired in relationship to

7
when the big black male came over to you?
A.  No.

8
Q.  Did it all seem to happen pretty fast?
A.  It just happened too fast.

9
Q.  How about the shots?  Could you tell what kind of sequence
they were being fired in?

10
A.  No.
Q.  Do you remember how many shots were fired?

11
A.  Was there any shots.
Q.  Can you remember how many shots were fired?

12
A.  No.
Q.  More than one?

13
A.  More than one.
Q.  Well, you're wrestling with the gun, does it at all take place by

14
the door of the apartment?
A.   No, we was - - it started in my living room door, then ended up

15
in front of my bathroom door, and it ended in front of Burt's closet.
..........................................................................................................

16

17 | RT 388-389.

18
Q.  Now, at some point in time, did all of you end up on the
ground?

19
A.  Yeah, we did.
Q.  What happened there?

20
A.  Well, when we all fell to the ground, that's when the big guy
bit me in the hand, *and I let the gun go, and then the little guy had*

21
*the gun.*
Q.  *What happened when the little guy had the gun?*

22
A.  Well, *we both fell on our butts 'cause we were like tug of war*
*with the gun, you know.  I let it go because the big guy bit me.  And*

23
*when I let it go, he backed up, I backed up, I fell down, and I got*
*up, and he was still on his butt clicking it towards me.*

24
Q.  *Do you know how many times he clicked it?*
*A.  No, I don't, but he was clicking it.*

25
Q.  Could you hear it clicking?
A.  Mm-hmm.

26
Q.  More than once?

12

1     A.  More than once.

2 RT 389-390 [Emphasis added].

3     This last portion is that to which the state appellate court specifically refers as

4 forming the basis for the felon in possession count:

5     However, after the completion of the two fatal shootings (and the
       nonfatal injuries to the defendant and Alex R.), the defendant
6      seized control of the gun, pointed it at Alex R. and attempted to
       shoot (a third murder charge avoided only by the fortuity of an
7      absence of ammunition).  This was the basis for the possession
       charge urged by the prosecution.

8

9 Ptn. Exh. A, p. 14.

10     In a later point on direct, the prosecutor references a crime report, which he does

11 not appear to have at hand, wherein he questions whether the witness (A. Ripoyla) had indicated

12 in a portion of the crime report that the black male who pointed the gun at him which he heard

13 clicking was the larger individual (the one who he had testified held the gun against his then-

14 girlfriend's face after two men kicked in the door and entered his apartment).  RT 382-385.

15     A.  No.
       Q.  You sure it was the small, black male that pointed the gun at you?
16      A.  Mm-hmm.
       Q.  Had the gun when it went click, click, click.
17      A.  Mn-hmm.
       Q.  I say, click, click, click.  Do you know how many times that
18      trigger was pulled when it fell on an empty cartridge?
       A.  No, but it was just clicking.
19

20 RT 396.

21     On cross-examination and re-cross, although defense counsel elicits testimony

22 from the witness that, inter alia, raises some question as to his relationship with petitioner,

23 whether his prior reporting or testimony has been consistent on several points, etc., the witness

24 \\\\\

25 \\\\\

26 \\\\\

1  does not alter the testimony he gave on direct with respect to petitioner's alleged actions with the

2  gun on cross-examination or re-cross.[6]  RT 401-417, 421-430, 435-439.

3           While petitioner in his testimony offers a wholly different version of events (see

4  section I A (C), supra), the jury had sufficient evidence before it to find and did find beyond a

5  reasonable doubt that the elements of the offense were met; it is for the jury to weigh the

6  credibility of the witnesses and to determine the facts.  The testimony supporting the conviction

7  does not lend itself to any interpretation as to the offense elements that petitioner's possession of

8  the firearm was other than knowing and with the required general criminal intent, i.e., not the

9  result of "misfortune or accident."

10          Petitioner's argument that murder jury instructions were deficient so therefore the

11  evidence was "tainted" and unavailable for use to support the felon in possession charge is a non

12  sequitur.  The evidence was what it was, regardless of the propriety of the instructions.  It is not

13  true that simply because a conviction for murder is reversed on account of improper instructions,

14  all of the indisputably admissible evidence related to the reversed conviction is somehow

15  unusable for another separately stated and charged conviction.  In this case all of the evidence in

16  the trial had the potential to be used to support the felon in possession charge, assuming its

17  relevance to that charge.  For example, although not specifically noted by the parties herein, there

18  was testimony by a homicide investigator that in the car petitioner borrowed discovered at the

19  scene on the night of the incident, police found, inter alia, a jar of bullets.  RT 137-138, 182, 184-

20  185.  Expert testimony was offered that those unfired cartridges matched those used in the

21  handgun at the crime scene.  RT 460-461.  Although petitioner denied that he had placed them

22  there, the owner of the car he had borrowed, Antrell Gross, a woman he was dating at the time

23  averred that she had no weapons and did not recognize the bullets and kept no ammunition in her

24

25          [6] A. Ripoyla's testimony as to the struggle with the gun and as to petitioner's having
   eventually obtained the gun and pointed it at Ripoyla and clicked the gun at him a number of
26  times is also consistent with his (Ripoyla's) testimony at the preliminary hearing.  CT 175-180,
   209-211.

1   car. RT 349-351, 354-355.  Although petitioner testified that he did not place the bullets in the

2   car (RT 565), jurors may not have found his explanation credible.  And although had they

3   believed he did put the bullets in the car, that is not enough to find that he was a felon in

4   possession of a firearm, it is relevant evidence militating in favor of a such a charge.

5          Obviously, if the jury believed A. Ripoyla to be a surviving victim and his

6   testimony that petitioner possessed a weapon after their struggle, pointed it at him, and dry-fired

7   the weapon at him under the mistaken impression that bullets were in the gun, the evidence was

8   more than sufficient to support the charge.

9          And, petitioner had a jury trial on the charge of felon in possession, had

10   instructions on that charge, and obtained a *never overturned* jury verdict on the charge.  To the

11   very doubtful extent that <u>Apprendi</u> has any applicability to this case, it was certainly satisfied on

12   the felon in possession charge.

13          The appellate court opinion contains an apparent, somewhat awkward, caveat that

14   sentencing on this count is appropriate if "the defendant is again convicted of additional offenses

15   on retrial." [7]  (<u>See</u> discussion immediately following).  While it is plain that the state court of

16   appeals anticipated a retrial on the murder counts, this does not diminish its determination that

17   the jury had convicted petitioner of possession of a firearm by a felon based on findings not

18   disturbed by those convictions that were reversed or of which petitioner was acquitted.  Petitioner

19   does not demonstrate that, absent a retrial on the attempted murder count, the jury's verdict as to

20   the possession of a firearm count is invalidated and that he was unconstitutionally deprived of

21

22          [7] Petitioner's footnote 2 in the traverse (pp. 7-8) indicates a correct view of the state
    appellate court's discussion of  Cal. Penal Code § 654 (cannot be sentenced twice for the same
23   conduct.)  Appellate counsel raised a last ditch issue that regardless of the propriety of the
    murder convictions, one could not be found to have used a gun in second degree felony murder
24   and also be sentenced on the felon in possession charge as well.  The court simply stated that the
    possession charge was divorced sufficiently from any murder charge to be separately sentenced
25   for that charge.  That state law determination became completely irrelevant to petitioner's case
    when *he was not re-tried on any other charge and his only sentence as it turned out was solely*
26   *for a felon in possession conviction.*

1   due process at the re-sentencing on the felon in possession of a firearm conviction.  The denial of

2   this claim by the state supreme court was not an unreasonable application of clearly established

3   Supreme Court authority.

4              B.  Claim 1- Ineffective Assistance of Appellate Counsel

5         *Standards for Ineffective Assistance of Counsel*

6              The test for demonstrating ineffective assistance of counsel is set forth in

7   Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

8   that, considering all the circumstances, counsel's performance fell below an objective standard of

9   reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

10  identify the acts or omissions that are alleged not to have been the result of reasonable

11  professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

12  whether in light of all the circumstances, the identified acts or omissions were outside the wide

13  range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

14  counsel's conduct was within the wide range of reasonable assistance, and that he exercised

15  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

16  695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

17             Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

18  693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

19  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

20  694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

21  confidence in the outcome."  Id., 104 S. Ct. at 2068.

22             In extraordinary cases, ineffective assistance of counsel claims are evaluated

23  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

24  1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

25             With respect to the deference to be accorded trial counsel, the Supreme Court has

26  recently emphasized the importance of such deference, especially in the AEDPA context, a

                                        16

standard for which there is no reason to doubt its equal applicability to appellate counsel:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

"In order to establish that counsel's assistance was sufficiently defective to require reversal, the defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant." Moormann v. Schriro, 426 F.3d 1044, 1055 (9th Cir. 2005), citing Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052 (1984).  A criminal defendant has a constitutional right to effective assistance of counsel on appeal.  Evitts v. Lucey, 496 U.S. 387, 396-397, 105 S. Ct. 830, 836-837 (1985).  The standard of Strickland applies to appellate counsel.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th cir. 1989) ("We review claims of ineffective assistance of appellate counsel according to the standard set out in Strickland v. Washington [])."  Appellate counsel is not obligated by the Constitution to "raise every 'colorable' claim suggested by a client."  Jones v. Barnes, 463 U.S. 745, 754, 103 S. Ct. 3308; see also Pollard v. White, 119 F.3d 1430, 1435 (9th Cir. 1997)("'A hallmark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the

1   court.'  Thus, whether appellate counsel acted unreasonably in failing to raise a particular issue is

2   often intertwined with the merits of the issue and whether the defendant would have prevailed."

3              To demonstrate prejudice petitioner must establish that it was reasonably

4   probable that, but for counsel's error, he would have prevailed on appeal.  Smith v. Robbins, 528

5   U.S. 259, 285-286, 120 S. Ct. 746 (2000).  The state supreme court's rejection or denial of this

6   claim must be proved to be "objectively unreasonable."  Bell v. Cone, at 698-699, 122 S. Ct. at

7   1852.

8       *Analysis*

9              Petitioner claims that he was denied effective assistance of appellate counsel

10   when, on petitioner's first direct appeal, his counsel did not, despite petitioner's request,

11   challenge petitioner's conviction on count 6, being a felon in possession of a firearm, because

12   counsel felt such a challenge had no merit.[8]  AP Mem., pp. 2-3.  Of the six counts upon which

13   petitioner was charged, set forth above (see procedural background), petitioner had been found

14   guilty by the jury of four, with enhancements: two counts of second degree murder (counts 1 and

15   2); assault with a firearm (count 4); possession of a firearm by an ex-felon (count 6).

16              In addition to averring that he asked his appellate counsel (on the first appeal) to

17   challenge the conviction on the felon in possession of a firearm count (count 6), whereupon his

18   counsel refused on the ground that such a claim on appeal lacked merit, petitioner maintains that

19   he never had a firearm in his possession.  AP, p. 4.

20              In the decision, the state appellate court had this to say as to the possession

21   conviction:

22          For guidance in the event of resentencing, the evidence shows a
            separate possession of the gun after the completion of the fatal
23          shootings, thus section 654 does not bar sentencing on this
            conviction.
24

25   ────────────────

26   [8] At various points, petitioner refers to this count as count 4, but it is, in fact, count 6.  See
     CT 639 (Abstract of Judgment, filed May 4, 1998).

18

1 ..................................................................................................

2 In the summary of the facts above, there is no evidence the
defendant possessed the gun at any point before the fatal struggle
3 with his accomplice and Alex R.  However, after the completion of
the two fatal shootings (and the nonfatal injuries to the defendant
4 and Alex R.), the defendant seized control of the gun, pointed it at
Alex R. and attempted to shoot (a third murder charge avoided
5 only by the fortuity of an absence of ammunition).  This was the
basis for the possession charge urged by the prosecution.  Although
6 the jury unaccountably acquitted the defendant of an attempt to kill
Alex R., this conduct is nonetheless sufficiently divorced from the
7 murders to permit separate punishment for this possession of the
gun if the defendant is again convicted of additional offenses on
8 retrial.

9 Ptn. Exh. A, pp. 3, 14-15.

10      As respondent notes in petitioner's appellate counsel's opening brief, the

11 following issues were raised: 1) trial court erred in instructing on the second degree felony

12 murder rule based on an assault with a deadly weapon; 2) trial court erred in instructing on the

13 second degree murder rule as to the killing of White; 3) conviction for assault with a firearm

14 must be reversed because the evidence was insufficient to support the finding defendant aided

15 and abetted White in the assault; 4) jury finding the 1988 prior conviction was under Cal. Penal

16 Code §§ 667(d) and 1170.12 was made in error and must be vacated; 5) punishment for

17 possession of a firearm by an ex-felon was improper double punishment prohibited by Cal. Penal

18 Code § 654; 6) case must be remanded for resentencing because trial court was under the

19 mistaken belief that it had no discretion to impose other than consecutive sentences.  Answer, p.

20 16, Exh. B, Appellate's Opening Brief (AOB).

21      Having obtained a reversal of two counts of second degree murder and an

22 acquittal on the assault with a firearm count, and having had stricken a finding by the jury that

23 the 1988 prior conviction for assault with a deadly weapon could be applied under the recidivist

24 statute, as well as having obtained a direction from the appeals court to the trial court that on

25 remand it be made evident that the trial court did have discretion in imposing sentence, it is

26 apparent that petitioner was ably and well-served by his appellate counsel.  In addition, the court

1  does not find irrelevant in evaluating the merits of an ineffective assistance of appellate counsel

2  claim with respect to a challenge that was not raised consideration of the universe of claims

3  which were brought by appellate counsel, claims upon which counsel (and petitioner) prevailed;

4  to do otherwise would be to proceed in a vacuum.

5  Moreover, the only issue raised in the direct appeal of the 25-to-life sentence on

6  re-sentencing solely on the felon in possession of a firearm charge concerned the increased

7  restitution fine, as a result of which the original fine was re-instated.  Exh. B to petition, 3/19/01,

8  Third District Court of Appeal decision, p. 5.  Petitioner evidently faulted his appellate counsel

9  on both his first and second appeals (in both of which counsel were successful as to the issues

10  raised) for not having raised a challenge to the conviction and subsequent re-sentencing on the

11  felon in possession of a firearm charge (see petitioner's Exh. C, petition to state supreme court,

12  filed on 7/05/01 and petitioner's Exh. D, petition to state supreme court, filed on 6/17/03).

13  Petitioner contends that given the jury's acquittal of petitioner on the burglary

14  charge, the dismissal of the attempted murder count on the prosecutor's motion (after the jury

15  failed to convict on that count), the appellate court's direction of an entry of acquittal by the trial

16  court of petitioner on the assault charge and reversal of the second degree murder convictions,

17  there is no valid jury finding that petitioner possessed a firearm to support that conviction.  AP,

18  p. 6.

19  Petitioner relies on Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348.

20  Petitioner further contends that, under Strickland, the failure to raise a challenge to the validity of

21  the conviction on direct appeal was prejudicial ineffective assistance of counsel on appeal.  In the

22  traverse, petitioner faults respondent in the answer for having failed to argue that petitioner's

23  appellate counsel made a strategic decision that petitioner's chances were somehow enhanced on

24  direct appeal by ignoring petitioner's request to challenge the conviction for possession of a

25  firearm, a count which ultimately resulted in petitioner's indeterminate life sentence.  Traverse,

26  p. 3.  However, it is petitioner's initial burden to demonstrate how failure to raise the claim was

20

1  deficient on the part of petitioner's appellate counsel.

2       Although petitioner does not set it forth as clearly in the second amended petition

3  and the supporting memorandum as it is stated in the traverse, he avers that the basis for his

4  claim is not the sufficiency of the evidence in support of the felon in possession conviction but

5  rather that the conviction occurred in the context of a trial wherein the second degree murder

6  convictions were overturned due to blatant <u>Ireland</u>[9] error and, independent of that error, reversal

7  of the assault conviction occurred because of insufficient evidence.  Traverse, pp. 3, 4.

8       Petitioner cites the following excerpts from the appellate court

9  opinion:

10      Unaccountably, the trial court and the parties agreed to instructions
    which are the functional equivalent of the instructions condemned

11      in *Ireland*.  (E.g., 70 Cal.2d at p. 538.)  Given the tenor of the
    prosecution's closing argument, in which he focused on the

12      perpetrators' entrance with gun drawn as the basis for a conviction,
    he may have believed a theory of second degree felony-murder

13      could be premised an one of several contemporaneous assaults that
    did not culminate in a homicide. ... [the jury's] question indicates

14      the jury believed more than one assault occurred in this case.
    Consequently, the theory of second degree felony murder was

15      legally flawed.

16  Exh. A to AP, pp. 10-11.

17       Petitioner goes on to argue that the claim is that there is no evidence untainted by

18  the improper instruction and arguments for second-degree murder liability that supported the

19  possession of a firearm charge.  As set forth with regard to petitioner's claim 2 (the first claim set

20  forth in section III A), the court finds this argument to be wholly irrelevant with respect to jury

21  instructions found to be fatally flawed as to counts other than those related to the felon in

22  possession of a firearm; the evidence was not tainted by the flawed jury instructions and that

23  evidence was more than sufficient to support the charge.  <u>See</u> discussion in the section

24  immediately preceding.

25  _____

26     [9] <u>People v. Ireland</u>, 70 Cal.2d 522 (Cal. 1969).

1   As the appeals court explicitly found a sufficient basis/evidence for the jury's

2   conviction, a conviction beyond a reasonable doubt on this count, it can hardly be said that

3   failing to raise a challenge to the validity of this conviction was prejudicial ineffective assistance

4   of appellate counsel.  In other words, even if the first prong of unreasonable performance were

5   met, which it is not, there can be no showing of prejudice as to the second prong in light of the

6   appellate court's determination that the conviction as to count 6 remained intact.

7   In any event, petitioner has failed to meet his burden to show how a failure to

8   challenge the firearm possession conviction constituted deficient performance by his appellate

9   counsel such that a prejudice analysis need even be reached.  The denial of this claim by the state

10   supreme court was not an unreasonable application of clearly established Supreme Court

11   authority.

12   C.  Claim 3 - Petitioner denied his Sixth Amendment right to trial on the

13   possession of a firearm count

14   Once again relying on In re Winship, supra, petitioner contends that he was denied

15   his Sixth Amendment right to a trial on the firearm possession count when the trial court failed to

16   order a retrial.  AP, p. 7.  Stating that petitioner testified at trial that he never possessed a firearm,

17   petitioner reiterates that the only contrary testimony presented was that of Ripoyla[10] (see, infra).

18   Petitioner states again, as well, that the jury failed to reach a verdict on the attempted murder

19   

20   [10] Petitioner makes a reference to testimony from Alex Ripoyla and a bare reference
to testimony from "Beish."  Beish is not mentioned by respondent as offering relevant testimony
in support of petitioner's firearm possession by a felon conviction.  Kimberly Beish is listed as

21   Kimberly Ripoyla in the Reporter's Transcript index; both she and Alex Ripoyla testified at the
trial that she had married Alex Ripoyla some time after the events at issue.  RT 292-293; RT 375.

22   Respondent does not assert that the state appellate court relied on anything other than the
testimony of A. Ripoyla for the felon in possession charge, and the testimony of "Beish" is

23   mentioned nowhere else in the briefing other than in this one undeveloped mention.  An
independent  review by this court of the testimony of Ms. Ripoyla indicates that she did not offer

24   testimony  directly on point as to the charge at issue, but was a witness, inter alia, to the struggle
between her then-boyfriend A. Ripoyla and the other two men (as also described by Alex

25   Ripoyla), as well as to gunshots fired prior to her exiting through a bedroom window, apparently
just before the episode to which A. Ripoyla testified concerning petitioner's obtaining

26   possession, aiming and dry-firing the weapon at him.  RT 301-302, 319,

charge, which charge was dismissed on the prosecutor's motion after the jury failed to convict on

that count, and reasserts that as all the other counts involving a gun either resulted in acquittal

(the burglary charge)[11] or were effectively never tried (the two murder counts – Tobler and White

– , and the attempted murder count – Ripoyla), that no valid jury verdict supports the firearm

possession verdict.

Petitioner has not met his burden to demonstrate that no valid jury verdict

supports the felon in possession of a firearm charge.  In fact, the record demonstrates that the

state appellate court found that the separate and distinct charge of felon in possession of firearm

count was sufficiently supported by the trial evidence.  (See preceding discussions).  As noted,

petitioner received a trial on this count, separate, unchallenged and untainted jury instructions as

to this count for which the jury found petitioner guilty beyond a reasonable doubt, in full

compliance with the requirements of Winship.

The state supreme court's denial of this claim was not an unreasonable application

of established Supreme Court authority.

D.  Claim 4 - Life sentence for status offense of being a felon in possession of

a firearm is cruel and unusual punishment and grossly disproportionate to the offense in violation

of the Eighth Amendment

Petitioner contends that his sentence constitutes cruel and unusual punishment

because the status offense for being a felon in possession of a firearm is not classified under the

state's Three Strikes law as "serious" or "violent" enough to count as a first or second strike.

Mem., p. 9, citing Cal. Penal Code §§ 667(d), 667.5(c), 1192.7(c) and 1192.8; United States v.

Garcia-Cruz, 978 F.2d 537, 542[, 543] (9th Cir. 1992) (prior conviction for being a felon in

possession of a firearm not an adequate predicate felony under the Armed Career Criminal Act);

_____

[11] Although petitioner does not note it here, the assault charge was also reversed by the
state court of appeals and the trial court was directed to enter a verdict of acquittal as to that
count.  AP, Exh. A, pp. 12-13, 16.

1   United States v. Sahakian, 965 F.2d 740[,741], 742 (9th Cir. 1992) (being a felon in possession of

2   a firearm not a crime of violence for purposes of applying the Career Offender guideline).

3           Outside of the application of the Three Strikes law, triggered in this case solely

4   upon the firearm possession by a felon conviction, this felony offense, while a "straight felony,"

5   petitioner argues, may be punished by a probation or imprisonment for sixteen months, two years

6   or three years.  Mem., pp. 9-10, citing Cal. Penal Code §§ 18, 489(b), 672, 1170(b); Cal. Rule of

7   Court 420(a).  Mem., p. 10.  Even if the three-year sentence, which requires aggravating

8   circumstances, is imposed, if maximum good time and work credits are earned, time served is

9   actually eighteen months, according to petitioner.  Id., citing Cal. Penal Code §§ 2930-2933, the

10  provisions of which concern prison rules and regulations (§ 2930); process of application of good

11  behavior (§ 2931) and worktime credits (§ 2933); procedure and grounds for denial of time

12  credits for  criminal acts or disciplinary offenses/misconduct (§ 2932).

13          Petitioner argues that the court cannot rely on facts that resulted, inter alia, in the

14  deaths of two people when those facts have not been proven beyond a reasonable doubt to a jury

15  to increase the sentence for the firearm possession offense from three years to a life sentence.

16  Mem., p. 10, citing Apprendi, supra, and Jones v. United States, 526 U.S. 227, 119 U. S. Ct.

17  1215 (1999).  According to petitioner, he is unlikely to receive parole after serving the 25-year

18  minimum.  AP Mem., p. 8, citing California Dept. of Corrections v. Morales, 514 U.S. 499, 510-

19  511, 115 S. Ct. 1597, 1603-1604 (1995).   Petitioner maintains that he is likely to be viewed as a

20  double murderer by the Board of Prison Terms even though no valid jury verdict supports

21  convictions on these counts.  AP Mem., p. 9.

22          Petitioner contends that before the Three Strikes law, the sentence imposed upon

23  him was reserved for those convicted of first degree murder and, even considering petitioner's

24  priors, the sentence is grossly disproportionate since no other state would impose a mandatory

25  life term, citing Alabama Statutes § 13 A-11-72, § 13A-6-6(e).  AP Mem., p. 11.

26  \\\\\

1    In <u>Jones v. United States</u>, at 243, 119 S. Ct. at 1224 n.6, the Supreme Court, in

2    finding that the government's interpretation of a federal carjacking statute may violate the

3    Constitution, states as its underlying principle: "under the Due Process Clause of the Fifth

4    Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other

5    than prior conviction) that increases the maximum penalty for a crime must be charged in an

6    indictment, submitted to a jury, and proven beyond a reasonable doubt."). Petitioner's reliance

7    on <u>Jones</u> is clearly misplaced as the Supreme Court recognizes an exception explicitly applicable

8    here; namely, that when the fact increasing the maximum sentence that is imposed is based on a

9    prior conviction (or convictions), as occurred here, petitioner's due process and jury trial rights

10   are not implicated. Petitioner's speculation that the BPT will "convict" petitioner of the murder

11   charges so as to deny parole suitability (and thereby avoid <u>Jones</u>) is just that – speculation. It

12   also misapprehends the function of the BPT.

13   Like the petitioner in <u>Lockyer v. Andrade</u>, petitioner in the instant case cites, inter

14   alia, <u>Solem v. Helm</u>, 463 U.S. 277, 103 S. Ct. 3001, (1983), a precedent which the subsequent

15   <u>Andrade</u> Court recognized as clearly establishing only the gross disproportionately principle, "the

16   precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme'

17   case." <u>Lockyer v. Andrade</u>, 538 U.S. at 73, 123 S. Ct. at 1173.

18   "Under California's three strikes law, any felony can constitute the third strike,

19   and thus can subject a defendant to a term of 25 years to life in prison." <u>Lockyer v. Andrade</u>, 538

20   U.S. 63, 67, 123 S. Ct. 1166, 1170. Although a sentence that is "grossly disproportionate" to the

21   crime committed violates the Eighth Amendment prohibition against cruel and unusual

22   punishment, state legislative policies directed to the problem of criminal recidivism are an

23   important factor and are entitled to great deference in weighing the "gravity of the offense" for

24   which an enhanced sentence is given under state repeat offender laws. <u>Ewing v. California</u>, 538

25   U.S. 11, 29-30, 123 S. Ct. 1179, 1189-1190 (2003). Deference given to state recidivism policies

26   in Eighth Amendment cases, however, is not unlimited. <u>Id</u>. at 30, 123 S. Ct. at 1190. And in

1    some "exceedingly rare" and "extreme case[s]," sentences validly imposed under a state

2    recidivism statute may still violate the Eighth Amendment.  Lockyer v. Andrade, 538 U.S. at 73.

3    123 S. Ct. at 1173; Ewing v. California, 538 U.S. at 30, 123 S. Ct. at 1190.

4              Each of the above cases involved an Eighth Amendment challenge after the

5    sentences for relatively minor offenses were greatly enhanced pursuant to state repeat offender

6    laws.  They also involved enhanced sentences that mandated a minimum term of imprisonment

7    by reason of the defendant's repeat offender status that was higher than the maximum prison

8    term that could have been imposed for the same crime as a first offense.  In each of these cases,

9    the Supreme Court first found that the "gross disproportionality" standard was the applicable

10   legal standard.  Next, the Court reasoned that the "gravity of the offense" for which the enhanced

11   sentence was imposed must be assessed under the Eighth Amendment, not only by reference to

12   the nature and severity of the triggering offense, but also by reference to the state's recidivism

13   policy, as expressed in the state's repeat offender statutes, and to the totality of the offender's

14   criminal history.

15             In Andrade and Ewing, the Supreme Court affirmed California Three Strikes Law

16   sentences for two "career criminals" with lengthy criminal histories and triggering offenses that

17   repeated their prior crimes.  In Andrade, a federal habeas proceeding, the defendant was

18   convicted of two felony counts of petty theft with a prior conviction and sentenced to two

19   consecutive terms of 25 years to life.  Andrade's criminal history included the following

20   activities: multiple counts of burglary, for which he was sentenced to 120 months in prison;

21   misdemeanor theft, for which he was sentenced to six days in jail with a year of probation;

22   transportation of marijuana, for which he was sentenced to eight years in federal prison;

23   misdemeanor theft, for which he was sentenced to 180 days in jail; and transportation of

24   marijuana, for which he was sentenced to 191 days in federal prison.  He was also arrested for a

25   state parole violation arising from his escape from federal prison.  The Supreme Court held that

26   because "the precise contours" of the gross disproportionality principle were "unclear" the state

1  court did not make an objectively unreasonable application of clearly established federal law.

2  Lockyer, 538 U.S. at 68-70.

3        In Ewing, a direct appeal case, the Supreme Court affirmed the state court's

4  upholding of Ewing's sentence of 25 years to life in prison.  Ewing, 538 U.S. at 29-30.  The

5  triggering offense for Three Strikes Law purposes was grand theft of $1,200 of merchandise and

6  was petitioner's fifteenth conviction for which he had previously served nine separate terms of

7  incarceration.  Id. at 18.  Petitioner's criminal history evidenced a pattern of increasing violence.

8  While noting that Ewing's triggering offense of grand theft "was certainly not one of the most

9  passive felonies a person could commit . . . . In weighing the gravity of Ewing's offense, we must

10 place on the scales not only his current felony, but also his long history of felony recidivism.

11 Any other approach would fail to accord proper deference to the policy judgments that find

12 expression in the legislature's choice of sanctions."  Id. at 28-30.  After careful consideration of

13 Ewing's triggering offense, along with his long, violent criminal history, the Court ruled that

14 Ewing's sentence did not raise an inference of gross disproportionality.  Id. at 30.

15       In a relatively recent case decided post-Andrade and Ewing and unaddressed in

16 the briefing of the parties herein, the Ninth Circuit found that the 25-year-to-life sentence under

17 the Three Strikes Law was unconstitutional where imposed for a third offense of shoplifting a

18 $199 VCR and the petitioner's prior criminal history consisted solely of two convictions for

19 second-degree robbery upon a single guilty plea.  Ramirez v. Castro, 365 F.3d 755 (9th Cir.

20 2004).  The federal appellate court held that these facts constituted one of those "exceedingly

21 rare" cases, referenced in Lockyer v. Andrade, supra, in which the sentence imposed was grossly

22 disproportionate.  Ramirez, 365 F.3d at 756-57.  Prosecutors in the 1996 charge used two

23 nonviolent shoplifting offenses committed in 1991 to which petitioner had pled guilty for which

24 he had served one sentence of just over six months in county jail to charge petitioner with one

25 count of petty theft with a prior theft-related conviction, punishable as a felony, after which the

26 jury found the 1991 convictions were strikes.  Id. at 756.  Although the trial court, pre-trial, had

1   indicated an inclination to do so, it denied Ramirez's motion to strike one or both of the two

2   prior shoplifts.  Id.  The 25-year-to-life sentence imposed for three shoplifting convictions, the

3   Ninth Circuit noted, was more severe than that which would have been imposed if any of the

4   crimes had been murder, manslaughter or rape.  Id.

5          Ramirez pled guilty to the two earlier shoplifting offenses, unaware that he was

6   putting two strikes on his record, since the Three Strikes Law had not yet been enacted.  Id. at

7   757.   He took the plea for a one year sentence in county jail and three years probation after

8   having allegedly been told that his failure to do so would result in his sister, also implicated in

9   one of the shoplifts, being sentenced to five years in prison.  Id.  Ramirez served six months and

10  twenty days, was released and completed probation without incident.  Id.  Ramirez had no

11  encounters with the law until the third shoplifting offense several years later in which no force or

12  violence was associated; minimal force was associated with the prior offenses.  Id. at 757-58.

13  Ramirez could have been charged with a misdemeanor petty theft and sentenced to a maximum

14  of six months in jail.  Id. at 758.  Ramirez, unlike the recidivists in Helm, Ewing and Andrade,

15  (and unlike petitioner herein) had never been sentenced to state prison, and in his entire criminal

16  history, had only served one period of incarceration in county jail.  Id., at 769.   Finding

17  Ramirez's case to constitute one of "the extremely rare case that gives rise to an inference of

18  gross disproportionality,...." the court proceeded to a comparative analysis of his sentence, intra

19  and inter jurisdictionally.  Id ., at 770-773.  The state court was ultimately found to have

20  unreasonably applied the gross disproportionality principle to the "unique facts of Ramirez's

21  case."  Id., at 774.

22          In light of Andrade and Ewing, petitioner's sentence herein could only be found to

23  be grossly disproportionate to the crime committed for Eighth Amendment purposes if the facts

24  of his case were sufficiently analogous to those of the "extremely rare" case identified in

25  Ramirez.   The appellate court emphasized as key factors favoring Ramirez circumstances that

26  are absent here: Ramirez's prior convictions did not involve the use of a weapon, nor did they

28

1  result in incarceration in state prison.  Nothing in the record indicated that Ramirez had had run-

2  ins with the law other than the three shoplifting convictions.  Although the portions of the

3  Clerk's Transcript containing petitioner's probation report were not part of the record submitted

4  to the court, petitioner does not dispute the criminal history as set forth by respondent.   Answer,

5  pp. 21-22, citing CT 614, 617.  Because petitioner does not take issue with the criminal record

6  set forth by respondent, the court will assume that the record is true and accurate.

7          As a juvenile, petitioner was convicted of attempted vandalism, trespassing,

8  vehicle theft, possession of stolen property, two counts of grand theft, and assault with a deadly

9  weapon.  Answer, p. 21, citing CT 616-617.  As an adult, petitioner was convicted of assault with

10  a deadly weapon on May 13, 1980.  Id., citing CT 614.

11          This charge involved petitioner shooting a 22-year-old man in the lower
           abdomen with a small caliber handgun.  After petitioner shot the victim,
12          he reportedly pointed the gun at others and said, "Don't move," then fled.
           (Id.)  On June 19, 1984, petitioner was convicted of robbing a video store
13          clerk with a sawed-off shotgun.  During the robbery, petitioner was
           carrying a sawed-off pump shotgun and ordered everyone in the store to lie
14          on the floor or else they would be shot.  (Id.)  On July 19, 1988, petitioner
           was convicted of assault with a deadly weapon in which petitioner
15          threatened to kill the victim, then pointed a revolver at him.  Petitioner's
           brother grabbed the gun and during a struggle a round was fired from the
16          handgun, and the bullet became lodged in the ceiling.  (CT 615).

17  Answer, pp. 21-22.

18          Respondent is correct that petitioner's criminal record evidences a history of

19  serious and violent crimes.  The trial court found that the 1980 conviction for assault with a

20  deadly weapon and the 1984 conviction for robbery were true.  AP, Exh. C, CT 594, 629.

21  Petitioner has convictions for serious and violent criminal conduct other than those that served as

22  the two strikes.   Prior to the convictions that resulted in his two prior strikes, petitioner's

23  juvenile criminal history shows a repeated pattern of engagement in and escalation of criminal

24  activity.  Petitioner's two prior convictions involved force and violence.  As did the defendants in

25  Ewing and Andrade, petitioner has a lengthy criminal history, evidently spanning over 20 years,

26  and has apparently been incarcerated in state prison at least twice prior to the current sentence

1  (once for his 1980 conviction and once for his 1984 conviction).  Petitioner's criminal history is

2  evidently more serious and involves more violence than did that of either of the petitioners in

3  Lockyer v. Andrade and Ewing, and does not come near to demonstrating a criminal record

4  sufficiently analogous to that of Ramirez to warrant habeas relief.   Petitioner's record of

5  convictions shows an almost uninterrupted pattern of serious and violent criminal conduct

6  between the time he was released from incarceration on his two prior strikes and convicted of the

7  third strike (which did not consider his 1988 conviction).[12]

8          Accordingly, the state supreme court's denial of this claim did not constitute an

9  objectively unreasonable application of Supreme Court precedent, and petitioner is not entitled to

10  habeas relief on this ground.

11          E.  Claim 5- Conviction and life sentence for status offense of being a felon in

12  possession of a firearm violates petitioner's right to due process and the Eighth Amendment

13  prohibition against cruel and unusual punishment as the only evidence that he possessed a

14  firearm independent of the invalid verdicts was not found by the jury to be true beyond a

15  reasonable doubt

16          Petitioner asserts that there is no evidence except that intertwined with the

17  attempted murder count, upon which the jury hung, that supports the conviction for possession of

18  a firearm by a felon, arguing that the state court of appeals explained that the prosecution had

19  premised the possession of the firearm charge on the attempted murder count that was dismissed.

20

21          [12] Petitioner has not raised a Romero issue with regard to re-sentencing on the felon in
    possession of a firearm count by the trial judge after the state appellate court's reversals of the
22  murder counts and the direction of acquittal on assault with a deadly weapon conviction.  CT
    681-682, 686-691.  People v. (Superior Court) Romero, 13 Cal.4th 497, 529-530, 53 Cal. Rptr.2d
23  789 (trial court, acting on its own motion, has discretion to strike prior felony conviction
    allegations under Three Strikes Law).  At footnote 13, the state's high court specifically opens
24  the door to a claim by a defendant, on appeal or by a habeas petition, where the trial court
    imposing a sentence under the Three Strikes law "misunderstood the scope of its discretion to
25  strike felony conviction allegations in furtherance of justice pursuant to [Cal. Penal. Code]
    section 1385(a)...."  Id. at 530.  Assuming any applicability of such a claim to the circumstances
26  in this case, the undersigned finds any such claim has been waived.

1   Mem., p. 12.  Petitioner reasserts that conviction of the firearm count without a retrial violates

2   petitioner's due process rights because there is no "valid jury finding on the facts supporting all

3   the elements of that offense...."  Id.  This argument is wrongly premised; as has been made plain,

4   the jury did convict petitioner of all the facts supporting the firearm possession charge—that the

5   jury could not agree that all the facts proved beyond a reasonable doubt that petitioner had

6   attempted to murder A. Ripoyla does not undermine their conviction of petitioner on the

7   evidence presented to them that he possessed a firearm.

8            Because the denial of this claim by the California Supreme Court was not an

9   unreasonable application of clearly established Supreme Court authority, this claim should be

10  denied.

11           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

12  a writ of habeas corpus be denied.

13           These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

15  after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

18  shall be served and filed within ten days after service of the objections.  The parties are advised

19  that failure to file objections within the specified time may waive the right to appeal the District

20  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21  DATED:  5/9/06

22                                                  /s/ Gregory G. Hollows

23                                                  _____
                                                    GREGORY G. HOLLOWS
24                                                  UNITED STATES MAGISTRATE JUDGE

25  GGH:009
    lowe0882.fr

26

31